UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| COLLENE COLLIER, KAREN GROCE and BARRY KUSNICK, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MEDCARE INVESTMENT CORPORATION d/b/a MEDCARE INVESTMENT FUNDS, CARDIOVASCULAR CARE GROUP, INC., and CCG OF LOUISIANA, LLC,<br><br>Defendants. | Civ. Case No. _____<br><br>**CLASS ACTION** |

**CLASS ACTION COMPLAINT**

Plaintiffs Collene Collier, Karen Groce, and Barry Kusnick ("Plaintiffs"), on behalf of themselves and a putative class of similarly situated former employees of MedCare Investment Corporation d/b/a Medcare Investment Funds, Cardiovascular Care Group, Inc., and CCG of Louisiana, LLC (the "Defendants"), by way of this Class Action Complaint against Defendants, allege as follows:

**NATURE OF THE ACTION**

1. This is a class action for the recovery by Plaintiffs and the other similarly situated employees against Defendants who as parent employers made the decision to close Plaintiffs direct employers Louisiana Medical Center and Heart Hospital, LLC, aka Louisiana Heart Hospital, LLC (hereinafter "LHH") and LMCHH PCP, LLC (together, the "Hospital") in Lacombe, Louisiana. The decisions by the Defendants to close the Hospital caused the termination of Plaintiffs and approximately 700 employees without sixty days' advanced notice in violation of the WARN Act.

When the Hospital was put into Chapter 11 bankruptcy on January 30, 2017, the employees were first informed the Hospital was closing in February. Having not been given 60 days' advanced notice under the WARN Act, the employees' pay and health care terminated in February. The Plaintiffs seek up to 60 days of statutory back pay for the days of notice they did not receive and reimbursement for the medical expenses they incurred during that period.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367 and 29 U.S.C. § 2104(a)(5).

3. Venue is proper in this District pursuant to 29 U.S.C. § 2104(a)(5).

## THE PARTIES

*Plaintiffs*

4. Plaintiff Collene Collier worked at the facility located at 64030 Hwy 434, Lacombe, LA 70445 (the "Lacombe Facility") as a Registered Nurse Telemetry/Medical Surgery. She received her notice on or about February 1, which indicted that she would be laid off between February 15 and 28. Without any notice, she was terminated on February 6. Her insurance terminated in February 2017.

5. Plaintiff Karen Groce worked at the Lacombe Facility and served as a medical group support specialist until her termination in February 2017.

6. Plaintiff Barry Kusnick worked at the Lacombe Facility and served as an Interventional Cardiologist until his termination in February 2017.

*Defendants*

7. On information and belief, MedCare Investment Corporation d/b/a MedCare Investment Funds ("MedCare") has a place of business at 3322 West End Avenue, Suite 1100, Nashville, Tennessee 37203.

8. MedCare owned and maintained a group of private equity investment funds that held its "portfolio" health care device and health care service companies during the period relevant in this action, late-2016-through early 2017.

9. Defendant Cardiovascular Care Group, Inc. ("CCG") is a Delaware corporation with a place of business at 3322 West End Avenue, Suite 1100, Nashville, Tennessee 37203.

10. On information and belief, CCG is majority owned and operated by MedCare.

11. CCG owned and operated hospitals for MedCare during the period that provided cardiovascular care services.

12. On information and belief, in addition to CCG, MedCare owned and operated approximately fifteen to twenty (15-20) other portfolio companies.

13. On information and belief, Harry R. Jacobson, M.D. is the Chairman of MedCare, and President and Chairman of the Board of Directors of CCG.

14. On information and belief, CCG of Louisiana, LLC ("CCG LA") was a shell company of CCG created by MedCare to acquire and hold LHH.

15. On information and belief, LHH is approximately ninety-six percent (96%) owned by CCG LA and approximately four percent (4%) owned by a group of twenty-seven (27) physician investors.

16. On information and belief, LHH is the sole owner of LMCHH PCP, LLC, aka the Physicians Group, a Delaware corporation. LMCHH PCP, LLC employed the physician investors.

## FACTUAL BACKGROUND

17.     Upon information and belief at all relevant times, Defendants owned, maintained and operated their business employing approximately seven hundred (700) employees at the Lacombe Facility and other medical facilities (collectively "the Facilities"), as that term is defined by the WARN Act.

18.     Defendants employed the Hospital employees as parents who owned the Hospital, shared officers, directors and personnel policies with the Hospital, were depended on by the Hospital, exercised de facto control regarding the Hospital's day to day activities and made the final decision to close the facilities and lay off the employees without sixty days' notice.

**The Parents owned the subsidiaries**

19.     On information and belief, CCG acquired LHH in 2011 through its subsidiary, CCG LA.

20.     On information and belief, CCG acquired LHH to implement its corporate vision of building a network of cardiovascular specialty hospitals with an integrated delivery system.

21.     In addition to its ninety-six percent (96%) ownership of LHH, CCG also holds a secured loaned with an outstanding amount owed by LHH of $21,763,903, which accrues interest at a fixed monthly rate of seven and one-half percent (7.5%).

**The Parents shared officer and directors with the subsidiaries**

22.     On information and belief, CCG also managed LHH through its board dominated by CCG executives and as the employer of the remaining board members who directly reported to CCG's CEO.

23. According to LHH's Governing By-Laws, four of the eight board member seats represented "Corporate" that is, CCG. The four other seats represent physician-investors who were employed by LMCHH PCP, LLC (hereinafter "the Physicians Group").

24. The LHH Governing Board as of September 2016 consisted of CCG representatives: Warren Beck, CEO of CCG - also COO of LMCHH Physician Group; Doug Koppang, CCG Senior Vice President, Business Development; Steven Johnson, CCG, President and Chief Operating Officer; and Scott Boudreaux, CEO, LHH-Chairman of the Board.

25. The LHH Governing Board's physician members as of September 2016, all of whom reported as employees to Warren Beck, were Ali Amkieh, MD, Physician Investor, Medical Director, LHH; David Kaplan, MD, LHH, Physician Investor; John Breaux, MD, LHH, Physician Investor; and John Logan, MD, Physician Investor.

26. At the end of September 2016, Warren Beck left CCG. He was replaced by Robert Stillwell, who was the CFO of CCG, who took his place on the Governing Board.

27. A few months later, just before the decision to terminate the employees was made, Steven Johnson resigned and Gerhard Bette of the MedCare Investment Executive Committee joined the Governing Board to replace Mr. Johnson.

28. The LHH Governing Board's CCG representatives at the time the decisions were made to file for bankruptcy and close LHH were: Robert Stillwell, CFO, CEO of CCG; Doug Koppang, CCG Senior Vice President, Business Development; Scott Boudreaux, CEO, LHH and LMCHH, and Gerhard Bette, MedCare Investments Executive Committee. The physician-investor representatives, who at that point reported to Robert Stillwell in place of Warren Beck, remained the same as in September 2016.

29. On information and belief, the CCG management team that managed LHH included:

    i. Harry R. Jacobson, M.D., Chairman of the Board of MedCare and CCG;

    ii. Steven T. Johnson, MBA, President and Chief Operating Officer of CCG, and member of the Board of Directors of LHH;

    iii. Robert K. Stillwell, MBA, CPA – Chief Financial Officer of CCG and employed by MedCare, and a member of the Board of Directors of LHH, and - from August 2016 to February 2017 - effectively its Chairman of the Board; and

    iv. Douglas L. Koppang, Esq., and CPA, Executive Vice President of Business Development, CCG, and member of the Board of Directors of LHH.

30. Defendants shared common ownership, common officers and directors, and had interrelated business operations, for example, they put forth a joint business model to their patients and vendors and were parties to many of the same agreements.

**The Parents exercised de facto control over the subsidiaries**

31. On information and belief, CCG acquired LHH to implement its corporate vision of building a network of cardiovascular specialty hospitals with an integrated delivery system.

32. On information and belief, CCG sought to restructure LHH's operations by among other things: (a) integrating a multidisciplinary team of cardiovascular physicians and other medical specialists into LHH's preexisting team; (b) implementing a system of outreach clinics in surrounding communities to drive an increase in admissions; (c) developing strategic relationships with Louisiana State University's Fellowship program; and (d) establishing strategic relationships with Bogalusa Medical Center.

33. On information and belief, CCG LA acted as the Managing Member of LHH under LHH's operating agreement.

34. Before Warren Beck, who was the Chief Executive Officer of CCG and simultaneously the Chief Operating Office of LMCHH Physician Group, to whom the physician board members reported, left his posts, he worked day-to-day in an office at the LHH facility

35. On information and belief, CCG managed LHH through a Management Agreement which authorized CCG to manage the hospital and to provide all services and actions which CCG determined to be reasonably necessary or appropriate for the development and operation of the hospital; including, without limitation, the right to:

   a. Prepare a budget for the development and operations of the Hospital;

   b. Obtain equipment for the benefit of the hospital and enter into loans or other financing arrangements in connection therewith;

   c. Negotiate and enter into agreements regarding the purchase of goods or services for the Hospital;

   d. Expend all or portions of LHH's capital and income in furtherance of or relating to LHH's business and purposes;

   e. Employ or retain such persons, firms, or corporations to operate the Hospital;

   f. Enter into all leases deeds, contracts, rental agreements, construction contracts, sales agreements, and management contracts;

   g. Prepare, or cause to be prepared, all reports, statements, and other relevant information for distribution to LHH's members;

   h. Open, deposit and maintain funds in the name of LHH in banks or savings and loan associations; and

   i. Manage, direct, and guide the operation of the Hospital, including all necessary acts relating thereto.

36. Officers of MedCare and CCG made the executive level operating and personnel decisions of LHH.

37. Officers of MedCare/CCG made the decision to close LHH and therefore terminate its employees with fewer than sixty days' notice.

38. Harry R. Jacobson, M.D. personally appointed Anthony Morales as the Chief Medical Officer of LHH in or around 2013.

39. Over the past several years, Harry R. Jacobson personally would hold staff meetings at LHH several times a year. On these occasions, lasting several days, Jacobson would meet with small groups of physicians or staff directors in succession throughout the day. He would discuss operational issues such as the physicians' contracts, patient flow, productivity, and other concerns.

40. In Jacobson's meetings with LHH operations directors, he told them, among other things, to take specific steps to reduce costs, such as on materials, and to reduce payroll (or productivity) at slow periods such as around holidays by inducing employees to take personal days off or unpaid leave.

41. The Chief Executive Officer of LHH reported directly to CCG.

42. On information and belief, LHH, together with Medcare/CCG and CCG of LA, operated as a joint- or single employer and made the decisions and gave the orders that directly caused the terminations of Plaintiffs and other similarly-situated former employees in a mass layoff or plant closing on or about February 3, 2017 without providing sixty (60) days' advanced notice.

**The Parents shared unified personnel policies with the subsidiaries**

43. Defendants, along with LHH, maintained a single workforce at the Lacombe Facility whereby payroll and related obligations were processed by LHH's in-house payroll and paid from a single bank account.

44. On information and belief, LHH's payroll and payroll-related obligations were drawn from one bank account with Bank of America, N.A. held in the name of LHH.

45. The Hospital's medical clinics' operations were managed from and dependent on the Lacombe Facility.

46. Doctors at the LHH medical clinics floated among, and were shared by, the medical clinics and their "home" offices were part of, or annexed to, the Lacombe Facility.

47. Until approximately one year before the January 2017 bankruptcy, CCG directly paid the salary of the LHH CEO.

48. LHH only began paying its CEO's salary in 2016 because Med/CCG decided that all of CCG's employees would draw their salary and benefits from LHH, after which CCG's executives began drawing their compensation and benefits as if they were LHH employee-participants.

**The subsidiaries depended on the Parents for their operations**

49. Except for a revolving credit facility of under $10 million, CCG provided LHH its operating capital in the form of a Demand Promissory Note with a current balance of approximately $110 million.

50. CCG executives Steven T. Johnson and Douglas L. Koppang worked on a daily basis in a dedicated room in the Lacombe Facility and made routine operational decisions that ordinarily would be made by a chief operating officer, concerning all aspects of LHH's business.

51. LHH's Chief Financial Officer, Suzette Duhe, reported directly to Robert Stillwell of CCG.

52. Upon information and belief, in September of 2015, Defendants' medical group lost approximately $25 million, while the Lacombe Facility broke even.

53. Upon information and belief, despite poor financial performance, in or around March 2016, Defendants' medical group offered considerable signing bonuses, of as much as $1 million, to physicians.

54. Upon information and belief, the physician recruiting efforts were led by Douglas L. Koppang and Steven T. Johnson with the approval of Harry Jacobson, M.D.

55. Upon information and belief, from approximately May 2016 through August 2016, Defendants Medcare/CCG directed staff to create a shared website of financial and other information (the "lock box") accessible to prospective purchasers to assist with their due diligence efforts.

56. On information and belief, the shared website project was spearheaded by CCG CEO Robert Stillwell. He instructed LHH personnel what to place in the lock box.

57. Beginning on or about September 15, 2016, Defendants retained Solic Capital Advisors LLC ("SOLIC") to sell the Lacombe Facility and all of Defendants' clinics.

58. On information and belief, Arkansas Heart Hospital and Louisiana State University Hospital expressed limited interest in purchasing Defendants' operations. Neither requested access to Defendants' financial information in the lock box.

59. The only potential purchaser who obtained access to Defendant's lock box of financial information was LCMC Health, an affiliate of LHH.

60. On information and belief, LCMC Health obtained access to Defendants' financial information beginning in or around October 2016.

61. On information and belief, on or about January 19, 2017, LCMC Health declined to make an offer to purchase after its review of Defendants' financial information.

62. Although LHH's financial advisor, SOLIC, engaged in numerous discussions with potential purchasers concerning a sale of LHH, none of those discussions resulted in a viable offer acceptable to LHH.

63. On information and belief, LHH Governing Board held executive session meetings on January 19 and 26, 2017, and resolved to file for bankruptcy protection for LHH and close its facilities and shutdown.

64. On January 30, 2017, LHH filed for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code.

65. The petition and first day motions stated: LHH intended to begin a shutdown process.

66. On February 1, employees received a letter telling them they were going to be terminated in the period starting February 14 through February 28. Nevertheless, about three quarters of the workforce were terminated when they showed up for work between February 1 and February 13.

67. On or about February 28, the employees' health care coverage ceased.

68. In mid-March 2017, Plaintiff Collier was uninsured when her husband, who would have been covered under her plan, was injured in a vehicular accident. He suffered a broken, dislocated clavicle that was severely painful and required immediate surgery. Due to their financial hardship, an ex-LHH surgeon performed the surgery gratis. Nevertheless, the Colliers' medical bills stemming from the injury resulted in $50,000 of debt which will take them years to repay.

69. Upon information and belief, the Colliers are one of many former LHH employees who have been driven into steep debt because Defendants decided not to provide the employees their statutory 60 day notice in February-March 2017 before terminating them.

## FEDERAL WARN ACT CLASS ACTION ALLEGATIONS

70. Plaintiffs bring this Claim for Relief for violation of 29 U.S.C. § 2101 et seq., on behalf of themselves and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ. P. 23(a), who worked at, received assignments from, or reported to Defendants' Facilities and were terminated without cause beginning on or about February 3, 2017, and within thirty (30) days of that date, or were terminated without cause as the reasonably foreseeable consequence of the Defendants' final decisions to close the Facilities and/or lay off the affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

71. The persons in the WARN Class identified above (collectively, the "WARN Class Members") are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

72. Upon information and belief, Defendants employed more than one hundred (100) full-time employees who worked at or reported to the Facilities.

73. On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants.

74. On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of Defendants.

75. Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a) whether the members of the WARN Class were employees of the Defendants who worked at or reported to Defendants' Facilities;

(b) whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them sixty (60) days advance written notice in violation of the WARN Act; and

(c) whether Defendants unlawfully failed to pay the WARN Class members sixty (60) days wages and benefits as required by the WARN Act.

76. Plaintiffs' claims are typical of those of the WARN Class. Plaintiffs, like other WARN Class members, worked at or reported to Defendants' Facilities and were terminated beginning on or about February 3, 2017, due to the mass layoff and/or plant closing.

77. Plaintiffs will fairly and adequately protect the interests of the WARN Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

78. On or about February 3, 2017, Plaintiffs were terminated by Defendants as part of a mass layoff or a plant closing as defined by 29 U.S.C. § 2101(a)(2), (3), for which they were entitled to receive sixty (60) days advance written notice under the WARN Act. Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate Defendants, and the individual damages they suffer are small compared to the expense and burden the individual would face prosecuting this litigation alone.

79. Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

80. Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

81. The relief sought in this proceeding is equitable in nature.

## **CLAIMS FOR RELIEF**

### **First Cause of Action: Violation of the Federal WARN Act**

82. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

83. At all relevant times, Defendants employed more than one hundred (100) employees who in the aggregate worked at least four thousand (4,000) hours per week, exclusive of hours of overtime, within the United States.

84. At all relevant times, Defendants were each a parent to which their LHH subsidiaries were part, and thus an "employer" as those terms is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a)(3)(a)(1-2), in that, among other things, Defendants owned subsidiaries that were not separate because they shared officers, directors and personnel policies, exercised de facto regarding day to day activities and the final decision to close facilities and lay off the employees without sixty days' notice.

85. Defendants ordered a mass layoff and/or plant closing beginning on or about February 3, 2017 at the Lacombe Facility and other Facilities, as those terms are defined by 29 U.S.C. § 210l(a)(2) and 20 C.F.R. § 639.3(i).

86. The mass layoff or plant closing at the Facilities resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well as thirty-three percent (33%) of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2101(a)(8).

87. Plaintiffs and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants at the Facilities.

88. Plaintiffs and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

89. Defendants were required by the WARN Act to give the Plaintiffs and the Class Members at least sixty (60) days advance written notice of their terminations.

90. Defendants failed to give Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

91. Plaintiffs and each of the Class Members are "aggrieved employees" of Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

92. Defendants failed to pay Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, accrued vacation and personal time off for sixty (60) days following their respective terminations, and failed to make the pension and 401(k) contributions and provide employee benefits under COBRA for sixty (60) days from and after the dates of their respective terminations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated persons, prays for the following relief as against Defendants:

A. Certification of this action as a class action;

B. Designation of Plaintiffs as Class Representatives;

C. Appointment of the undersigned attorneys as Class Counsel;

D. A judgment in favor of Plaintiffs and each of the affected employees equal to the sum of: their unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, health and life insurance, pension and 401(k) contributions, and other ERISA benefits, for sixty (60) days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period, including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan

        if the employment loss had not occurred, all determined in accordance with the WARN Act, 29 U.S.C. § 2104(a)(1)(A), (B);

E.     Interest as allowed by law on the amounts owed under the preceding paragraphs;

F.     Plaintiffs' reasonable attorneys' fees and the costs and disbursements that the Plaintiffs incurred in prosecuting this action, as authorized by the WARN Act, 29 U.S.C. § 2104(a)(6); and

G.     Such other and further relief as this Court may deem just and proper.

Dated: April 2, 2018

        Respectfully submitted,

    By: /s/David W. Garrison
      **DAVID W. GARRISON (No. 24968)**
      **SETH M. HYATT (No. 31171)**
      BARRETT JOHNSTON MARTIN & GARRISON, LLC
      Bank of America Plaza
      414 Union Street, Suite 900
      Nashville, TN 37219
      Telephone: (615) 244-2202
      Facsimile: (615) 252-3798
      dgarrison@barrettjohnston.com
      shyatt@barrettjohnston.com

      Jack A. Raisner*
      René S. Roupinian*
      **OUTTEN & GOLDEN LLP**
      685 Third Avenue, 25th Floor
      New York, New York 10017
      Telephone: (212) 245-1000

      *Motion for admission pro hac vice forthcoming*

      *Attorneys for Plaintiffs and the putative class*